[No. 3701-1.   Division One.   October 4, 1976.]

PLATT ELECTRIC SUPPLY, INC., *Appellant*, v. THE CITY OF SEATTLE, ET AL, *Respondents*.

*Gelman & Couture* and *Herbert Gelman*, for appellant.

*John P. Harris, Corporation Counsel, Ross A. Radley* and *Lawrence K. McDonell, Assistants, Quigley, Hatch, Loveridge & Leslie,* and *Robert B. Leslie,* for respondents.

ANDERSEN, J.—

## FACTS OF CASE

Platt Electric Supply, Inc., submitted the lowest bid price-wise to supply the City of Seattle with the approximately $475,000 worth of electric light bulbs that it buys each year. The city purchasing agent, Mr. Tomi Terao, permitted one of Platt's competitors to lower its bid price and then awarded it the contract as the "lowest and best bidder." This litigation followed.

The testimony of the city purchasing agent, the defendant Terao, established the following.

The city purchasing agent's office sent written invitations to bid to various suppliers soliciting their sealed bids for

the "annual contract" to furnish the "complete requirements" of the City for the various categories of electric light bulbs which the City uses. These are called "lamps" in the trade and the bulk of those used by the City are sodium or mercury vapor lamps used to light the City's streets.

Seven bidders responded. Platt bid Westinghouse products and Graybar Electric Company, Inc., bid General Electric products as did two other suppliers. Two other firms bid Sylvania products and another bid Verda Ray products.

When the sealed bids were opened, price-wise Platt's bid was found to be the lowest. Graybar ranked fourth best price-wise of the seven firms bidding (although Graybar's bid was the lowest price-wise of the three firms which bid General Electric products). After approximately a month had gone by and Platt had heard nothing about the contract being let, its representative contacted the city purchasing agent concerning the delay. Mr. Terao, the purchasing agent for the City, then informed Platt that if it would lower its bid price, Platt would get the contract.

Platt declined the offer to lower its bid price. The city purchasing agent's office thereupon undertook a more extensive analysis of the bids.[1] That office and Mr. Terao then concluded that the warranty on the General Electric lamps bid by Graybar and two other suppliers was superior to the Westinghouse warranty on the lamps bid by Platt and, further, that the performance by Platt and its products in the many years Platt had supplied lamps to the City had not been entirely satisfactory.[2]

---

[1] There is some conflict within Mr. Terao's own testimony as to the exact sequence of events at this point. However, the precise time that the city purchasing agent's office undertook its several analyses is not material to our decision.

[2] Platt presented substantial evidence to the contrary of the purchasing agent's conclusions in this regard. This court, as an appellate court, however, will not retry the factual aspects of the case. The trial court's findings of fact appear to have accepted the City's version of the facts in this regard so for the purposes of the present appeal we must do the same. *Thorndike v. Hesperian Orchards, Inc.*, 54 Wn.2d 570 343 P.2d 183 (1959); *Charles Pankow, Inc. v. Holman Properties, Inc.*, 13 Wn. App. 537, 542, 536 P.2d 28 (1975).

The city purchasing agent's staff, along with Mr. Terao personally, entered into further negotiations as to price and warranty terms with Platt and also with Graybar. For various reasons, none of the five other bidders were included in the negotiations. Ultimately Graybar was permitted to reduce its bid price to or below Platt's bid and to change the terms of the warranty submitted with its bid. The purchasing agent thereupon declared Graybar to be the "lowest and best bidder" and awarded it the contract for the City's electric lamp requirements for 1 year. The contract as let to Graybar also included a provision giving the City an option to renew the contract for 1 year.

Platt sued to enjoin the City and Graybar from proceeding under the contract. The trial court found as a fact that the city purchasing agent had not abused his discretion in determining that Graybar was the lowest and best bidder and concluded that the city purchasing agent had followed the applicable law in awarding the lamp contract to Graybar. The trial court denied the injunction and Platt brings this appeal.

There are four issues in this case.

## ISSUES

ISSUE ONE. In letting a contract pursuant to the City of Seattle's competitive bidding law, did the city purchasing agent have the right, after the bid opening, to negotiate with an individual bidder to lower the bidder's bid price without giving the same opportunity to all bidders?

ISSUE TWO. Can an invitation to bid for a public contract authorize bidders responding thereto to determine their own specifications in any material degree?

ISSUE THREE. Can the terms of a public contract let pursuant to a competitive bidding law be substantially different from those stated in the invitation to bid?

ISSUE FOUR. What is the effect on the validity of a contract when the contract is not let in the manner required by a competitive bidding law or is let pursuant to defective specifications in the invitation to bid?

### DECISION

**ISSUE ONE.**

CONCLUSION. When competitive bidding is required of a municipality, as it is of the City of Seattle, the law does not permit the city purchasing agent to negotiate privately with a selected bidder or bidders for the purpose of obtaining a change in bids. If none of the bids are found to be satisfactory as submitted, new bids may be called for, provided that all parties who desire to bid are given the opportunity to do so.

■ It must be borne in mind that although a municipal purchasing agent necessarily has some discretion in selecting the lowest and best bidder, that discretion must be exercised not only reasonably and in good faith, but wholly within the law. Outside of the law, the city purchasing agent has no power to act. 10 E. McQuillin, *Municipal Corporations* § 29.72, at 418 (3d ed. rev. 1966).

■ It is now well settled that there is a strong public policy in the state of Washington favoring competitive bidding laws. The purposes of such laws, as declared by our State Supreme Court, are these:

> We appreciate fully that requiring public bidding on municipal contracts is "to prevent fraud, collusion, favoritism, and improvidence in the administration of public business, as well as to insure that the municipality receives the best work or supplies at the most reasonable prices practicable." *Edwards v. Renton*, 67 Wn.2d 598, 602, 409 P.2d 153, 157 (1965); 10 McQuillin, Municipal Corporations, § 29.29 (3d ed. rev. 1966).
>
> We are aware, too, that the requirement of public bidding is for the benefit of property holders and taxpayers, and not for the benefit of the bidders; and such requirements should be construed with the primary purpose of best advancing the public interest. 10 McQuillin, Municipal Corporations, § 29.29 (3d ed. rev. 1966).
>
> Although the primary purpose for the requirement of public bidding is for the protection of the general public, it is also recognized that another purpose is to provide a fair forum for those interested in undertaking public projects.

*Gostovich v. West Richland*, 75 Wn.2d 583, 587, 452 P.2d

737 (1969). *Accord, Miller v. State*, 73 Wn.2d 790, 793, 440 P.2d 840 (1968); *Savage v. State*, 75 Wn.2d 618, 621, 453 P.2d 613 (1969); *A.A.B. Electric, Inc. v. Stevenson Pub. School Dist. 303*, 5 Wn. App. 887, 890, 491 P.2d 684 (1971).

Although there is no *statutory* requirement that the City of Seattle make its purchases through competitive bidding, as there is for the State and most political subdivisions, the city charter requires it. The Seattle City Charter reads in pertinent part:

> Before making any purchase or sale, the purchasing agent *shall be required to secure bids* under such rules and regulations and subject to such exceptions as the council may by ordinance prescribe.
> All expenditures for supplies, materials or equipment involving more than such amount as may be specified by ordinance shall be made on written contract. All such contracts *shall be awarded to the lowest and best bidder*, after public advertisement as may be prescribed by ordinance.

(Italics ours.) Seattle City Charter art. 8, § 16.

There is also a Seattle city ordinance, ordinance No. 102151, which implements the competitive bidding provisions of the city charter. Among other things, the city purchasing ordinance provides: that except in emergencies, all City expenditures for supplies, materials, equipment, and services in excess of $2,500 "shall be made on written contract entered into upon the basis of competitive bids;" notices inviting sealed competitive bids are to be published; and written specifications are to be adopted so as to provide a sound basis for competitive bidding.

The provisions of the Seattle City Charter with respect to competitive bidding are mandatory and are binding on the City, its officials, and employees, as are the provisions of the City's purchasing ordinance so long as that ordinance remains in effect. 64 Am. Jur. 2d *Public Works and Contracts* § 36, at 889 (1972); 72 C.J.S. Supp. *Public Contracts* § 8, at 182 (1975); 10 E. McQuillin, *Municipal Corporations* § 29.30, at 326 (3d ed. rev. 1966).

The city purchasing agent, Mr. Terao, candidly expressed his position in this case when during the trial he was asked

and answered:

> Q  What was the purpose of advising Platt of what Graybar's last negotiated position was?
>
> A  My purpose was to get the lowest and best price. And I was just playing the two against each other.

When the city purchasing agent privately negotiated with Graybar and permitted Graybar to lower its bid price and change the warranty submitted with its bid, he violated the mandate of the city charter requiring that contracts such as this one "shall be awarded to the lowest and best bidder . . ." as well as the requirement of the City's purchasing ordinance that contracts such as this "shall be made on written contract entered into upon the basis of competitive bids."

> The law does not permit private negotiations with an individual bidder, nor any change of plans and specifications submitted for the competition, nor variances for the purpose of obtaining a change in the bid of one or more bidders. The whole matter is to be conducted with as much fairness, certainty, publicity, and absolute impartiality as any proceeding requiring the exercise of quasi-judicial authority. Thus, if after advertising for and receiving sealed proposals for the doing of public work for a municipality, none of the bids is found satisfactory, the public body has no authority to favor one of the bidders by negotiations with him privately, changing the scope of the work to be done or the terms of payment therefor in consideration of the reduction of his offer. All persons desiring to bid upon the work and willing to comply with the terms prescribed must have equal opportunities to do so; and if the work is not awarded upon the first competition for any legitimate reason, it must be submitted to a second, with full opportunity as before for all persons desiring to participate to do so.

(Footnote omitted.) 64 Am. Jur. 2d, *Public Works and Contracts* § 80, at 940 (1972). *Accord*, 10 E. McQuillin, *Municipal Corporations* § 29.72, at 416 (3d ed. rev. 1966); 72 C.J.S. Supp. *Public Contracts* § 10, at 186 (1975).

The City and Graybar argue, however, that since the City's purchasing ordinance uses the words "negotiate" and

"negotiation" in the portions of the ordinance dealing with the city purchasing agent's authority to determine the lowest and best bidder, he has the authority to negotiate price and terms after the bid openings, as he did in this case.[3] We disagree.

■ In the first place, to so construe the ordinance would change the mandate of the city charter requiring that such contracts "shall be awarded to the lowest and best bidder . . ." Seattle City Charter, *supra*. A city charter bears the same relation to city ordinances that a state constitution bears to state statutes. An ordinance, therefore, can no more change or limit the effect of a city charter than a legislative act can modify or supersede a provision of the state constitution. 5 E. McQuillin, *Municipal Corporations* § 15.19 (3d ed. rev. 1969).

In the second place, we do not read the ordinance as permitting this.

■ The practical inquiry in litigation requiring us to construe a statute or ordinance is usually to determine what a particular provision, clause, or word means. To answer it, one must proceed as he or she would with any other composition; that is, to construe it with reference to the leading idea or purpose of the whole instrument. A

---

[3]Seattle city ordinance No. 102151, § 5, reads in pertinent part: "The city purchasing agent may reject any or all bids, or parts of bids, and shall state in writing and keep a record of the reason or reasons for such rejection, which record shall be open to public inspection. Otherwise the city purchasing agent shall award the contract to the lowest and best bidder, or in the case of multiple awards to the lowest and best bidders, and in determining the best bidder may consider such factors, among others, as quality, delivery terms, and service reputation of the vendor.

"When in the judgment of the city purchasing agent, bids received require further information and analysis for the purpose of determining the lowest and best bidder, he may request that bidders provide pertinent information, and on receipt thereof *may negotiate* with one or more bidders and award such contract to the lowest and best bidder *as determined by such negotiation.*

"When two or more low bids received are for the same total amount or unit price, the city purchasing agent may allow such tied bidders to offer a lower price, or may make such purchase in the open market at a price not exceeding such bid price." (Italics ours.)

statute or ordinance is passed as a whole, and not in parts or sections, and is animated by one general purpose and intent. Consequently, each part or section should be construed in connection with every other part or section so as to produce a harmonious whole. 2A C. Sands, *Sutherland's Statutes and Statutory Construction* § 46.05, at 56 (4th ed. 1973); *Markham Advertising Co. v. State,* 73 Wn.2d 405, 419, 439 P.2d 248 (1968).

It is also elementary that in construing statutes or ordinances, effect must be given, if possible, to every word, clause, and sentence. 2A C. Sands, *Sutherland's Statutes and Statutory Construction* § 46.06, at 63 (4th ed. 1973); *Jordan v. O'Brien,* 79 Wn.2d 406, 410, 486 P.2d 290 (1971); *Metcalf v. Department of Motor Vehicles,* 11 Wn. App. 819, 822, 525 P.2d 819 (1974).

■ The words "negotiate" and "negotiation" used in the City's purchasing ordinance (see footnote 3) are words of many definitions. *See Grammer v. Skagit Valley Lumber Co.,* 162 Wash. 677, 682, 299 P. 376 (1931). It is true that in some contexts and under some definitions, these words could connote the authority to negotiate with respect to price and terms. To so hold here, however, we would have to disregard the mandating words "shall be made on written contract entered into upon the basis of competitive bids" which are used in the same ordinance.

Applying these rules of construction, we hold that the words "negotiate" and "negotiation" are used in the City's purchasing ordinance in the sense of dealing, communicating, or conferring. *See Grammer v. Skagit Valley Lumber Co., supra,* and *Black's Law Dictionary* 1188 (4th ed. 1968). Used in this sense, the portion of the ordinance in issue (see footnote 3) authorizes the city purchasing agent to deal, communicate, or confer with bidders, after their bids are opened, only for the limited purpose of determining such factors as quality and delivery terms (which it should be noted is expressly contemplated by the ordinance), as may be necessary for the purchasing agent's assistance in determining who is the lowest and best bidder. The words

"negotiate" and "negotiation" in the City's purchasing ordinance do not give the city purchasing agent the authority to change the terms or specifications of a bid or to solicit such changes.

One other aspect of the position taken by the City and Graybar in this connection also merits attention. As their arguments go, if the price paid by the City can be lowered by private negotiations with certain bidders, the taxpayers will benefit therefrom so public policy should favor such a practice. This is no more than to argue that the city purchasing agent should be permitted to negotiate all of the City's contracts without requiring competitive bidding at all.

Whether competitive bidding laws are permitted to be circumvented, or whether a bidder is permitted through negotiation to change his bid, as was done in this case, the risk involved is in our opinion precisely the same—the doors to possible fraud, collusion, and favoritism are opened. This cannot be permitted. *See Gostovich v. West Richland,* 75 Wn.2d 583, 452 P.2d 737 (1969).

A purchasing agent may obtain lower bid prices in an entirely acceptable way without circumventing the competitive bidding laws. That is, if the bids submitted to the City are unsatisfactory price-wise or unsatisfactory for any other legitimate reason, the City can reject them *all* and call for new bids. When this is done, all who desire to bid will have an equal opportunity to lower their bids and the courts will seldom, if ever, interfere with such a procedure. 64 Am. Jur. 2d *Public Works and Contracts* § 76 (1972); 10 E. McQuillin, *Municipal Corporations* § 29.77 (3d ed. rev. 1966).

It should be further noted in this connection, however, that when *less than all* the bids are rejected, the right to reject is more limited. When rejection of less than all the bids is permitted by the applicable law and the terms of the invitation to bid, the rejection cannot be done arbitrarily or in bad faith. 64 Am. Jur. 2d *Public Works and Contracts* § 76 (1972); 10 E. McQuillin, *Municipal Corporations* § 29.77

(3d ed. rev. 1966); *Bellingham Am. Publishing Co. v. Bellingham Publishing Co.*, 145 Wash. 25, 258 P. 836 (1927). When it is the low bid which is rejected, particularly close scrutiny of the reasons given for rejection is warranted. 10 E. McQuillin, *Municipal Corporations* § 29.73, at 421 (3d ed. rev. 1966).

The Seattle City Charter and the City's purchasing ordinance both required that the City's approximately $475,000 annual electric lamp contract be awarded by competitive bidding. The city purchasing agent was without authority to either privately negotiate the terms of bids with individual bidders after the bid opening, as he did here, or to award the contract to a bidder who had been allowed to change its bid after the sealed bids of all of the bidders had been opened, as he also did.

IssUE Two.

CONCLUSION. Public authorities seeking competitive bids must publish specifications which are sufficiently certain and definite to form a fair basis for competitive bidding.

It is suggested by Graybar that the findings of fact entered by the trial court are of sufficient breadth that they should be construed as finding that Graybar's original bid was the lowest and best bid when the terms of the warranty submitted with that bid are considered. It is true that such findings, as well as the trial court's oral decision, are not entirely clear in that respect.

It would not seem reasonable to believe that if Graybar's initial bid was the low bid by any measure, the city purchasing agent would first have offered the contract to Platt (as he did, providing that Platt would agree to lower its bid price); but we need not speculate in this regard. Neither is it necessary to remand the case to the trial court for additional findings, because even if Graybar is correct in its contention that it was originally the lowest and best bidder when its warranty was considered, we would nevertheless still find it necessary to invalidate the contract. Our reasons are these.

■ The only reference to warranties in the City's invitation to bid for the electric lamp contract was as follows:

> *In the event bidder offers a guarantee or warranty* as to the life of the lamps he proposes to furnish, such guarantee or warranty must be fully described in the bid and the method of adjustment for lamps failing prior to the end of the guarantee period will be set forth.

(Italics ours.) This was improper.

> Public authorities cannot lawfully ask each bidder to make his own plans and specifications and to base his bid thereon, and then, after the bids are received, adopt one of the offered plans with its specifications and accept the accompanying bid. Such a procedure would be destructive of competitive bidding and would give public officials an opportunity to exercise favoritism in awarding contracts. A contract cannot be said to have been let to the lowest and best bidder unless all bidders have been invited to bid upon the same specifications.

(Footnotes omitted.) 64 Am. Jur. 2d *Public Works and Contracts* § 50, at 901-02 (1972). Further,

> The rule requiring public authorities to give out plans and specifications for proposed public works and contracts before receiving bids therefor demands that the plans and specifications be so framed as to secure fair competition upon equal terms to all bidders, and to permit free and open bidding by all interested parties. The rule is one that is not to be frittered away by careless or indifferent application to specifications that are not clear, precise, and definite on matters material to the proposals on which bidders are invited to compete. Of course, the plans and specifications must comply with any and all statutory requirements.
>
> Specifications inviting bids for public contracts must be sufficiently detailed, definite, and precise upon all the essential elements that enter into the contract, so as to afford a basis for full and fair competitive bidding upon a common standard, and they should be free from any restrictions the effect of which would be to stifle competition; unless they are definite, so that all bids shall be upon the same proposition, there will be no real competition and no basis on which to determine which bid is the lowest, and thus the door to favoritism and improvidence

will be opened. They properly should be complete within themselves.

(Footnotes omitted.) 64 Am. Jur. 2d *Public Works and Contracts* § 51, at 902-03 (1972). *Accord,* 10 E. McQuillin, *Municipal Corporations* § 29.54, at 378 (3d ed. rev. 1966); 72 C.J.S. Supp. *Public Contracts* § 10, at 186 (1975).

The manner in which the invitations to bid were put out to prospective bidders in this case was improper. Warranties were not specified in the invitations to bid. Yet when the bids were opened, the bid involving Verda Ray products, for example, was summarily rejected because it did not contain a warranty. Then the bidder that ranked fourth price-wise out of seven bidders, Graybar, was permitted to argue, as it again does here, that because of its claimed superior warranty, it was really the lowest and best bidder of them all. Such practices are destructive of competitive bidding.

As the record in this case amply reflects, the lack of proper specifications in invitations to bid also makes it virtually impossible for a trial court, however diligent, to determine whether or not there has been an abuse of discretion by the contract awarding authority.

Public authorities seeking competitive bids must publish specifications which are sufficiently certain and definite to form a fair basis for competitive bidding. The City did not do so here.

ISSUE THREE.

CONCLUSION. A public contract awarded pursuant to competitive bidding procedures must be substantially in accordance with the terms of the invitation to bid.

In the present case, the invitations to bid called for an "annual contract" to furnish the City's electric lamp requirements. Nothing was mentioned therein, either directly or inferentially, about an option to extend the contract. When the contract was ultimately let by the City to Graybar, however, the contract included an option on the part of the City to extend the contract for 1 year. This was improper. The city purchasing agent conceded in his testi-

mony that it would be important to bidders to know that what they were bidding on might turn out to be a 2-year contract.

The City and Graybar cite *Savage v. State*, 75 Wn.2d 618, 453 P.2d 613 (1969), where the court approved the letting of a state contract with an option to extend the 1-year contract. That case is not in point since in *Savage*, the invitation to bid advised the bidders of the option. As the court there noted, "[a]ll bidders had an equal opportunity to compete." *Savage v. State, supra* at 621.

As pointed out in connection with our discussion of Issue One where contracts are required to be let on the basis of competitive bids, the law does not permit the city purchasing agent's office to privately negotiate with a selected bidder or bidders for the purpose of obtaining a change in bids. Similarly, if the City wanted an option to renew the contract, it was incumbent on it to so specify in the original invitations to bid or else to call for new bids and so specify, thus giving *all* parties desiring to bid a contract with a 1-year option to extend it an equal opportunity to do so. *See* 10 E. McQuillin, *Municipal Corporations* § 29.72, at 416 (3d ed. rev. 1966).

It is also urged by the City and Graybar that since Platt's own bid offered the City an option to renew, Platt has no standing to now object to Graybar having such an option in its contract with the City. Were the issue whether Graybar or Platt is entitled to the contract, that might well be correct. The ultimate issue in the present case, however, is not whether Graybar or Platt is entitled to the City's electric lamp contract, but whether the contract entered into between the City and Graybar is illegal and should be enjoined. *See Bellingham Am. Publishing Co. v. Bellingham Publishing Co.*, 145 Wash. 25, 28, 258 P. 836 (1927).

The 1-year electric lamp contract awarded to Graybar by the City included an option that the City could extend it for another year. This option was a substantial term of the contract so awarded and was not included in

the invitations to bid. Public contracts awarded pursuant to competitive bidding procedures must be substantially in accordance with the terms of the invitation to bid. The contract between the City and Graybar was not. 10 E. McQuillin, *Municipal Corporations* § 29.72 (3d ed. rev. 1966).

ISSUE FOUR.

CONCLUSION. A public contract which has been let in violation of a competitive bidding law is illegal and void.

■ The effect on contracts, which have been entered into in violation of competitive bidding laws, is as follows:

> A contract for public work or supplies or for a public improvement, made in violation or defiance of constitutional or statutory provisions or ordinances requiring such contracts to be awarded to the low bidders only after advertisement and competitive bidding, is illegal and void and imposes no obligation or liability upon the public body. Provisions of this kind are a limitation, so to speak, upon the general power of the municipality to make contracts for such purposes.

(Footnote omitted.) 64 Am. Jur. 2d *Public Works and Contracts* § 38, at 890 (1972). *Accord,* 10 E. McQuillin, *Municipal Corporations* § 29.41 (3d ed. rev. 1966); 72 C.J.S. Supp. *Public Contracts* § 19 (1975).

For each and all of the foregoing reasons, we hold that the electric lamp contract entered into between the City and Graybar to be illegal and void.

We reverse and remand this case to the trial court with instructions to enter an order enjoining the City of Seattle and Graybar Electric Company, Inc., from proceeding under the electric lamp contract between them or under any extensions of such contract.

WILLIAMS, C.J., and CALLOW, J., concur.

Petition for rehearing denied February 23, 1977.

Review by Supreme Court pending September 29, 1977.