Hillsborough
No. 80-224

GERARD CONSTRUCTION COMPANY, INC. *& a.*

v.

CITY OF MANCHESTER *& a.*

June 11, 1980

*McLane, Graf, Raulerson & Middleton,* of Manchester (*James R. Muirhead* orally), for the plaintiff.

*Elmer T. Bourque,* city solicitor, by brief and orally, for the defendant.

*Sheehan, Phinney, Bass & Green,* of Manchester (*Henry B. Stebbins* orally), for the intervenor, Charles Construction Company, Inc.

PER CURIAM. The issue before us is whether a municipality may lawfully consider differences in proposed completion times in determining the lowest responsible bidder when the project specifications fail to clearly indicate either a completion date or that the length of construction time would be a determining factor in awarding the contract. We hold that under the circumstances of this case, a difference in proposed construction time is not an appropriate factor for consideration in determining the lowest responsible bidder.

This case arises from the following circumstances. On February 14, 1980, the City of Manchester (defendant), through its Joint School Building Committee established under RSA 199:3, invited

bids for the construction of Area 15 Regional Vocational Education Center. *See* RSA ch. 188-E. The plaintiff, Gerard Construction Company, Inc. (Gerard), and the intervenor, Charles Construction Company, Inc. (Charles), both bid on the project. The notice to bidders and bid specifications contained no project completion date; rather, the bid proposal form contained blank spaces in which bidders were to indicate the number of calendar days and months in which they would complete the project. It appears that although certain of the defendant's school officials understood that the expected date for occupancy of the school was to be in September 1981, this information was neither included in the specifications nor communicated to potential bidders. The bid form did require a lump sum price and required a schedule of certain price reductions for specified site alternatives that is not pertinent here.

In all, the defendant received eight bids. The lump sum bid prices ranged from a low of $6,693,900 to a high of $7,378,000, while completion times ranged from a low of 500 days to a high of 730 days. Gerard's proposal contained the lowest lump sum price but involved the longest completion time, 730 days. Charles' proposal, though containing a lump sum price one hundred dollars higher than Gerard's, indicated a construction time of 540 days, or six months less than Gerard's bid.

On March 17, 1980, the Joint School Building Committee (committee) met to consider the bids. The minutes of this meeting reveal, among other things, the committee's concern with the time of completion of the project. At the close of the meeting, the committee voted to recommend acceptance of Charles as the project contractor. Shortly thereafter, Charles was notified of the committee's recommendation and forthwith commenced project planning.

Meanwhile, upon learning that in spite of its lower bid price, the project was to be awarded to another firm, representatives of Gerard sought and obtained a hearing before the committee on March 27, 1980. No representative of Charles was at the hearing. At the hearing, two vice-presidents of Gerard appeared and explained to the committee that their firm possessed the capability and intention of completing the project in 540 days; that the longer period specified in the Gerard bid was a very conservative estimate that was only offered because there was no indication in the specifications that an earlier time for completion was required. Counsel for Gerard indicated his view that the earlier completion

date proposed by Charles afforded no ground for denying the contract to the low bidder when time was not made an essential element of the contract. Following the hearing, and after seeking legal advice from the city solicitor's office, the committee voted on April 15, 1980, to award the contract to Gerard.

The appropriation of funds for the center was scheduled to be considered by the board of mayor and aldermen of the city of Manchester (board) on May 6, 1980. Upon learning of the committee's reversal, however, Charles successfully persuaded the board to table the issue and to direct the committee to reconsider its decision designating Gerard the contractor. The board directed the committee, upon reconsideration, to consider certain other factors beyond price in determining the lowest responsible bidder.

In response to the board's order, the committee met on May 9, 1980, to reconsider the issue. The Manchester City Charter contains the following provision:

> II. In determining the lowest responsible bidder, in addition to price, the following shall be considered:
>
> (a) The ability, capacity and skill of the bidder to perform the contract or provide the service required;
>
> (b) Whether the bidder can perform the contract or provide the service promptly, or within the time specified, without delay or interference;
>
> (c) The character, integrity, reputation, judgment, experience and efficiency of the bidder;
>
> (d) The quality of performance of previous contracts or services.

Part E, Article V, Sec. 5.4, II of the Special Acts of the City of Manchester.

At the hearing, the committee proceeded to hear evidence to the effect that the city would incur substantial additional costs should the project extend to the twenty-four months specified in the Gerard bid. Among these costs were $12,000 to $15,000 salary expense to retain a clerk of the works for an additional half year, $37,500 storage expense to warehouse equipment purchased for the project and the unspecified inflationary expense of delaying certain material purchases. Beyond these pecuniary considerations, evidence was presented by school officials that a September 1981 occupancy of the facility would benefit the children of Manchester.

Following the hearing and after several hours of deliberations, the committee voted to award the contract to Charles. The

committee based its award in part on the fact that while Gerard's lump sum price was only one hundred dollars less than Charles', the latter proposed to complete the project 190 days sooner. The substantial savings to the city emanating from an earlier completion date, in the committee's view, rendered Charles' the lowest responsible bid.

On the following Monday, May 12, 1980, Gerard petitioned the Hillsborough County Superior Court for an order, *ex parte*, temporarily restraining the defendants from contracting with Charles on the grounds that such an award was illegal in respect to the Manchester Charter provisions relative to competitive bidding. The order was granted by *Pappagianis*, J., who subsequently granted Gerard's motion for an expedited final hearing. On May 13, 1980, Charles was allowed to intervene by the court. The final hearing was held on May 15, 1980, over Charles' objection, at which the records of the various proceedings, as well as other evidence, were presented. By an order dated May 19, 1980, the court found that though all the parties had acted in good faith, the times of completion of the project were not lawful considerations under the charter provisions for competitive bidding. Accordingly, it entered a declaratory judgment that as between Gerard and Charles, Gerard submitted the lowest bid on the skills center and "is entitled to the contract in the current bid circumstances if the appropriate municipal authorities find that Gerard Construction Company, Inc., is a responsible contractor." Thereafter, Charles filed a notice of appeal in this court.

■■ All parties to this appeal acknowledge that the case turns upon an interpretation of the city's competitive bidding provisions. Absent such an ordinance, municipalities, like private parties, generally are free to contract without the requirement of advertisement and competitive bidding. 72 C.J.S., Supp. *Public Contracts* § 8 (1975); 64 AM. JUR. 2d *Public Works and Contracts* § 36 (1972); *see* 10 E. MCQUILLIN, MUNICIPAL CORPORATIONS § 29.05 (3d ed. 1966). Where such provisions are in force, however, strict compliance with the municipal scheme is required; otherwise the contract award is void. *See State v. Cote*, 95 N.H. 428, 65 A.2d 280 (1949); *Platt Elec. Sup., Inc. v. City of Seattle*, 16 Wash. App. 265, 555 P.2d 421 (1976); 10 E. MCQUILLIN, *supra* at § 29.28.

The defendant's competitive bidding procedures are contained in part E, article V, section 5.4 of the Special Acts of the City of Manchester or, more commonly, its charter. It provides that "[a]ll purchases . . . for materials, equipment, supplies, services,

insurance, building repairs or any other item, in an amount exceeding five hundred dollars shall be by competitive bidding . . . to the *lowest responsible bidder*." (Emphasis added.) Subsection II provides four other criteria, in addition to price, that must be considered in determining the lowest responsible bid; the only one of these relied upon by the defendant, subsection II(b), mandates consideration "[w]hether the bidder can perform the contract . . . promptly, or within the time specified, without delay or interference." The defendant maintains that this provision requires, or at least allows, the committee to consider the time difference between the Gerard and Charles bids. We agree with the trial court, however, that subsection II(b) stands for no such proposition.

■ We construe subsection II(b) as authorizing an inquiry whether the bidder can perform the project promptly according to its own proposal; that is to say, whether he can or will meet promptly the deadlines that he has himself proposed. *See Phifer v. City of Bayonne,* 105 N.J.L. 524, 146 A. 463 (1929). This provision does not, *ipso facto,* serve to make completion time an essential specification. Insofar as Gerard's qualifications have never been questioned, we agree with the trial court's ruling that subsection II(b) provides no authority for considering differences in completion time in determining the low bid.

■ Similarly, we reject the argument that inclusion of the phrase "time is of the essence" in the architect's specifications served to put bidders on notice that savings resulting from earlier completion times would be considered in determining the lowest reasonable bid. Rather, it only served to put bidders on notice that the city would seek a penalty should the successful bidder fail to complete the project according to the bidder's own schedule. *Phifer v. City of Bayonne supra; Edmundson v. Board of Education,* 248 Pa. 559, 94 A. 248 (1915).

■ We are buttressed in our view by an analysis of the purposes of requiring competitive bidding. These procedures serve to invite competition, "guard against favoritism, improvidence, extravagance, fraud and corruption, and . . . secure the best work or supplies at the lowest price practicable. . . ." 10 E. MCQUILLIN, *supra* at § 29.29; 72 C.J.S. Supp. *Public Contracts* at § 8. Moreover, a more than incidental benefit of mandatory competitive bidding is a safeguarding of the interests of those who bid on public works. *Boger Contracting v. Bd. of Com'rs, etc.,* 396 N.E.2d 1059 (Ohio

App., 1978); *Platt Elec. Sup., Inc. v. City of Seattle*, 16 Wash. App. 265, 555 P.2d 421 (1976). Central to this scheme is the notion "that every prospective bidder should have identical information upon which to submit a proposal." *Boger Contracting v. Bd. of Com'rs, etc., supra* at 1062; *Platt Elec. Sup., Inc. v. City of Seattle, supra* at 276, 555 P.2d at 429. But this concept is subverted where, as here, the determination of the low bid rests upon a time requirement not clearly incorporated into the specifications. *Id.; see also Leininger v. Ward*, 126 Okla. 114, 258 P. 863 (1927). In *Edmundson v. Board of Public Education*, 248 Pa. 559, 94 A. 248 (1915), the city of Pittsburgh had put out to bid a proposed new high school. The advertisement did not specify a completion date, and the contract was awarded to a bidder whose bid was higher than several others but who proposed the earliest completion date. The court, in reversing the lower court's denial of an injunction against the proposed contract, had this to say:

> "The School Code provides for competitive bids and, upon grounds of public policy and under the rules regulating the awarding of contracts by public authorities, if the essential element of the time of completion of a contract may be omitted from the specifications upon which bids are asked, there cannot be fair competitive bidding.
>
> If the bidders had all been put upon a common basis as to the time for the completion of the building, who can say that the school board would not have accepted a lower bid as being the best?"

248 Pa. at 563, 94 A. at 250. We agree with this reasoning and therefore affirm the ruling of the trial court that in this case completion time could not be used, after the receipt of bids, to determine the "lowest responsible bidder." In so holding, we are not unmindful of the cases that have upheld such action by municipal authorities under similar statutes. *See, e.g., Fosson v. Fiscal Court of Boyd County*, 369 S.W.2d 108 (Ky. 1963); *Duffy v. Village of Princeton*, 240 Minn. 9, 60 N.W.2d 27 (1953); *Vellaco v. City of Derby*, 232 A.2d 335 (Conn. Super. 1966). In *Fosson*, however, the bid specifications expressly advised bidders that the number of days specified, as well as the price, could affect the award, 369 S.W.2d at 108; *Duffy* involved expert testimony that it was customary in power equipment contracts not to specify a completion date and to do so would preclude any bids, 240 Minn.

at 12, 60 N.W.2d at 29; however, faced with an almost identical factual situation, the court in *Vellaco* sustained the municipality, relying on a broad interpretation of the city's discretion, 232 A.2d at 337. We consider it a better rule to restrict the determination of the "lowest responsible bidder" to the terms actually contained in the proposal.

■■■■■ We lastly consider the appropriateness of the trial court's ruling that Gerard, as the low bidder, is entitled to the contract, subject only to the city's determination whether Gerard is a responsible contractor. We believe that the provisions of the Manchester city charter relative to competitive bidding should be construed as mandating that the contract be awarded to the lowest bidder that is responsible. *Housing Authority of Opelousas, La. v. Pittman Constr. Co.*, 264 F.2d 695, 702 (5th Cir. 1959); *City of Inglewood L.A. Cty. Civ. Ctr. A. v. Superior Ct.*, 7 Cal.3d 861, 867, 500 P.2d 601, 604 (1972). This court gives statutory language its ordinary meaning and will do so whenever the occasion arises. *See, e.g., State Employees' Ass'n of N.H. v. Bd. of Trustees of the Univ. of N.H.*, 120 N.H. 272, 415 A.2d 665 (1980). We are not unmindful, however, that the defendant asserts substantial pecuniary and other reasons that militate in favor of completion of the proposed skills center in eighteen rather than twenty-four months. We see no purpose in a literal enforcement of the charter provision designed to safeguard the public fisc that results in a substantial and unnecessary expenditure of public funds. Accordingly, we hold that if Gerard is found by the appropriate municipal authorities to be a responsible contractor, the defendant must either accept its bid or, alternatively, reject all bids and readvertise the project.

*Affirmed.*